UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBIN DELORENZO,<br><br>Plaintiff,<br><br>- against -<br><br>NATIONAL FOOTBALL LEAGUE; WALTER ANDERSON; AND BYRON BOSTON<br><br>Defendant. | **COMPLAINT**<br><br>PLAINTIFF DEMANDS A TRIAL BY JURY |

Plaintiff ROBIN DELORENZO ("Plaintiff"), by her attorneys, Magarian & DiMercurio, APLC (*pro hac vice* pending) and Vladeck, Raskin & Clark, P.C. complains against Defendants NATIONAL FOOTBALL LEAGUE ("the NFL"), WALTER ANDERSON ("Anderson"), and BYRON BOSTON ("Boston") (collectively, "Defendants") as follows:

## NATURE OF CLAIMS

1.      For years, the NFL has publicly celebrated its purported commitment to diversity, equity, and inclusion. It highlights the few women who break into historically male-controlled spaces as proof that barriers are falling. But Defendants' treatment of Plaintiff tells a far different story – one in which those public commitments collapse the moment a woman depends on them for equal treatment, support, or even basic dignity.

2.      As set forth in detail herein, Plaintiff's career was not derailed by lack of ability, effort, or dedication. It was destroyed because she is a woman in an institution that, despite its slogans, is structurally unwilling to treat women as equals. From the moment she arrived, she was subjected to gender-based scrutiny, humiliation, disparate training, unequal gear, and open hostility. She was denied the support and development routinely afforded to male officials,

graded through a system built and controlled by men who had fixated on her gender from day one, and punished when she reported harassment or insisted on being treated with basic respect.

3. What happened to Plaintiff is not an isolated misunderstanding. It is the predictable outcome of a workplace that still views female officials as novelties to be controlled, disciplined, or pushed out – never as professionals entitled to equal opportunity. The NFL had every chance to intervene, to support her, and to apply its policies fairly. Instead, it silenced complaints, rewarded the men who mistreated her, and ultimately terminated her using the very metrics corrupted by that discrimination.

4. Plaintiff's experience exposes the gap between what the NFL says about inclusion and how it actually treats the women who depend on that promise. And the consequences to her career, reputation, and emotional well-being have been profound and permanent.

5. The unlawful conduct described herein constitutes a pattern and continuing violation extending through Plaintiff's termination and even beyond.

6. The NFL's conduct violated Title VII of the Civil Rights Act of 1964, as amended, 42 USC § 2000e et al ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL") and the New Jersey Law Against Discrimination N.J.S.A. 10:5-1 *et seq.* ("NJLAD"). Anderson's and Boston's conduct violated the NYSHRL, NYCHRL, and NJLAD.

## PARTIES, JURISDICTION, VENUE, AND ADMINSTRATIVE PREREQUISITES

7. Plaintiff is a woman and a former official for the NFL who was discriminated, retaliated against, and subjected to a hostile work environment (harassment) at the hands of Defendants. At all relevant times, she has resided in the State of New Jersey.

2

8.    Defendant the NFL is a trade association with its principal place of business located at 345 Park Avenue, New York, NY 10154.

9.    Defendant Anderson is a man and the former Senior Vice President of Officiating for the NFL, who was Plaintiff's direct supervisor during her employment with the NFL. On information and belief, Anderson resides in Harris County, Texas.

10.    Defendant Boston is a man who was Plaintiff's trainer, exercising supervisory authority over her, with the NFL; and very close friends with Anderson. On information and belief, Boston resides in Fort Bend County, Texas.

11.    At all relevant times, Defendants Anderson and Boston were employees, supervisors, managers, and/or agents of the NFL and exercised authority over Plaintiff's employment. At all relevant times, Anderson and Boston personally participated in, directed, authorized, aided and abetted, and/or ratified the unlawful discriminatory, retaliatory, and harassing conduct alleged herein. At all relevant times, Anderson and Boston had the authority to make, influence, or recommend employment decisions affecting Plaintiff, including but not limited to assignments, discipline, evaluation, compensation, and termination. Defendants Anderson and Boston are individually liable under the NYSHRL, NYCHRL, and NJLAD because they directly participated in, authorized, ratified, and/or aided and abetted the unlawful discriminatory, retaliatory, and harassing conduct alleged herein. Each exercised supervisory authority over Plaintiff and used that authority to carry out and perpetuate the unlawful conduct.

12.    The NYSHRL and NYCHRL apply because Plaintiff's employment relationship had a substantial nexus to New York and a direct impact within New York City. The NFL maintained its principal place of business and headquarters in New York City, from which it

3

centrally administered, controlled, and directed Plaintiff's employment. Specifically, the NFL, through its New York City operations, among other things:

   a. Made all material employment decisions affecting Plaintiff, including discipline, assignments, evaluation, and termination;

   b. Established and enforced policies governing Plaintiff's employment;

   c. Conducted performance evaluations and grading;

   d. Administered payroll, compensation, and benefits; and

   e. Maintained Plaintiff's employment records.

   f. Plaintiff's role was not tied to a single geographic worksite but instead involved nationally distributed work assignments, while the core functions of supervision, evaluation, and decision-making were consistently anchored in New York City.

13.    Prior to being hired by the NFL, Plaintiff attended training and clinics at the NFL's New York City headquarters. Thereafter, she visited headquarters for other employment-related reasons, including watching Monday Night Football from the replay room and meeting in person with Anderson. She also went to the NFL's physicians in New York City for her annual physicals.

14.    As a result, Plaintiff's employment was functionally based in and centered on New York City, which served as the primary locus of control, supervision, and decision-making for Plaintiff's employment. The unlawful acts alleged herein were conceived, directed, and implemented through NFL's New York City operations, and Plaintiff experienced the effects of those actions through her New York City–based employment relationship. Under these circumstances, the unlawful conduct had a sufficient impact within New York City within the meaning of *Hoffman v. Parade Publications* and its progeny. Accordingly, the application of the NYCHRL and NYSHRL is proper.

15.    The NJLAD also applies to Plaintiff's claims because Plaintiff's employment had a substantial connection to the State of New Jersey and the unlawful conduct alleged herein had effects within New Jersey. At all relevant times, Plaintiff resided in New Jersey and performed work within the State of New Jersey in connection with her employment. Plaintiff's job duties included assignments and work performed in New Jersey, including but not limited to officiating professional football games held at MetLife Stadium, the home stadium of the New York Giants and New York Jets. Plaintiff's work in New Jersey was a regular and anticipated component of her employment, and Plaintiff's performance, evaluation, and employment standing were directly affected by work performed within the State of New Jersey. The discriminatory, retaliatory, and harassing conduct alleged herein had a direct and substantial impact on Plaintiff within New Jersey, including but not limited to affecting Plaintiff's work assignments, professional opportunities, compensation, and continued employment while she was working in and from New Jersey. The NFL conducted business in New Jersey and directed Plaintiff to perform work within the State, thereby establishing a sufficient nexus between Plaintiff's employment and New Jersey. Plaintiff also prepared for, traveled to, and returned from assignments in New Jersey, and her employment duties were repeatedly and foreseeably carried out within the State, further establishing NJLAD coverage. Accordingly, the application of the NJLAD is proper.

16.    Plaintiff's employment relationship spanned multiple jurisdictions and had substantial connections to both New York and New Jersey. Accordingly, Plaintiff asserts her claims under each applicable statutory scheme to ensure full relief under the law.

17.    This Court has jurisdiction over Plaintiff's Title VII claims under 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's NYSHRL NYCHRL, and NJLAD claims because these claims closely relate to the Title VII claims, having

arisen from a common nucleus of operative facts such that all claims form part of the same case or controversy.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the NFL's principal office is in New York, they regularly do business in New York, New York and some of the acts of discrimination, retaliation, and/or harassment occurred within the Southern District of New York.

19.    Pursuant to Section 8-502(c) of the NYCHRL, Plaintiff will cause to be served a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

20.    On or about December 10, 2025, Plaintiff filed a charge of discrimination and retaliation with the United States Equal Employment Opportunity Commission (the "EEOC") against the NFL, alleging violations of Title VII. On December 31, 2025, the EEOC issued Plaintiff a notice of her right to sue under Title VII. Plaintiff has thus complied fully with all administrative prerequisites.

## FACTUAL ALLEGATIONS

### Background

21.    Plaintiff worked for the NFL as an official from April of 2022 through February 18, 2025.

22.    Plaintiff's successful officiating career started at the high school level within the NJSIAA/NJFOA-North. After officiating in high schools throughout New Jersey (including being the first woman to ever work a high school state championship in New Jersey) for 11 years, her collegiate career began. Plaintiff worked junior college and Division 3 college football for two years. She proceeded to move up the levels through the Pennsylvania State Athletic Conference

6

(Division 2), Northeast Conference (Football Championship Subdivision), Mid-American Conference (where she began to work for Bill Carollo), and eventually progressed to the Big Ten Conference. During her Big Ten tenure, she was the first woman to ever work "The Game" (Ohio State v. Michigan, 2021) and a New Year's Six Bowl Game (The Fiesta Bowl).

23. Just prior to joining the NFL, Plaintiff had been officiating for the Big Ten Conference for two years. In her 20th season of officiating football, Plaintiff was hired by the NFL as an on-field official: at the time, she was one of only three women in history to achieve this career pinnacle.

24. Upon being hired with the NFL, Plaintiff was given access to a communication specialist ("the Communication Specialist") who had been retained by the NFL for the stated purpose of providing support to officials and acting as a conduit between the officials and their superiors. The Communication Specialist served in that capacity during Plaintiff's first two seasons with the NFL, throughout which Plaintiff and the Communication Specialist would communicate via zoom on a weekly basis. The Communication Specialist reported to Anderson. The Communication Specialist would share important information with Anderson about the officials and frequently attended meetings (zoom, in person, on the phone) when the supervisors in the officiating department were discussing all aspects of the officiating department.

<u>2022 Season (John Hussey Crew)</u>

25. For her first NFL season, Plaintiff was placed on the John Hussey ("Hussey") crew.

26. Below is a list (in no particular order of importance) of pertinent events from Plaintiff's first season (2022) with the NFL.

27. Examples of the early interactions that helped set the stage for what was to come in Plaintiff's NFL career are as follows:

a.  At mini-camp in Houston, which was Plaintiff's very first experience with her 2022 NLF crew, the following occurred:

   i.  Anderson directed Plaintiff to take her hair out of her hat when she worked (so that a ponytail would show out of the hole in the back of the hat). The implication being that this would make her look feminine and/or make her stand out as being a token female on the field. Plaintiff told him she preferred to keep her hair under her hat when she worked. This first conversation and rebuff should have been the end of the discussion about Mr. DeLorenzo's hair, but unfortunately it was not (as explained in para. 28).

   ii. Boston told Plaintiff she looked like a rookie because her Nike shorts did not have the NFL shield on them. In response, she explained that the Nike shorts the NFL had sent her did not fit because they were men's clothing. For example, they came down to the middle of her calf. As a result, she had purchased her own Nike women's gear shorts; hence the lack of NFL shield and apparent rookie-like appearance (which seemed like a better option than the humiliation of wearing men's shorts). This caused Plaintiff to buy NFL shield patches and iron them onto the shorts she had purchased before the next time she was to be seen in the shorts. In fact, Plaintiff was forced to (and did) continue to buy all of her own gear in women's sizes and iron a patch on them for the entirety of her three years employed by the NFL (see para. 31 for additional detail).

b.  Another early interaction with Anderson took place at the Steelers' training camp:

8

i. By way of background, during the training camps, it was common for coaches to have the rookie football players get up during a meeting in front of the whole team, coaches, and staff and embarrass themselves as a right of passage. Most players sing. During one of these right-of-passage sessions, Hussey told the Steelers' coach (Mike Tomlin) that the officiating crew also had a rookie on it (referring to Plaintiff), and that she should be made to sing in front of everyone as well. He did so right in front of her, without so much as giving her the courtesy to say whether or not she would be okay with this embarrassing proposition. Another coach who was present said her turn would be on Friday, and he provided a specific time. To be clear, Plaintiff did not want to be a part of this, but felt she had no choice and wanted to be a good sport given the way she was called out.

ii. On that Friday at the exact time that Plaintiff was scheduled to sing, Anderson showed up to the meeting. Anderson was clearly there to watch Plaintiff.

iii. Anderson made a comment to Plaintiff about wanting to video record her performance. She made clear that she expected to not be recorded, and he promised not to.

iv. Plaintiff proceeded to put on an utterly humiliating singing performance in front the entire Steelers' training camp team (far more players than on an active season roster), the Steelers' coaches (all men), her season one officiating crew (all men), and of course, Anderson. Thereafter, Anderson told her and her crew that he had in fact recorded part of her performance.

And sure enough, he had. He proceeded to show her the recording and Plaintiff insisted that he send it to her and delete the recording while she watched him do it. He complied, but this did not change the fact that he had recorded her against her will.

28.    After the first discussion about Plaintiff's hair, Anderson continued to insist that Plaintiff wear her hair in a ponytail. Feeling that Anderson's fixation on her hair was inappropriate (not to mention the fact that the comments were making her so uncomfortable she considered cutting off her hair), Plaintiff complained about Anderson's hair comments to: (1) the Communication Specialist; and (2) a co-worker who was previously the Senior Vice President of Officiating the NFL. Plaintiff's complaints were to conveyed to Anderson, and he was asked to stop discussing her hair. But because it had been such a fixation for Anderson leading up to this, Plaintiff felt that she had no choice but to compromise to appease Anderson and avoid retaliation (especially now that she had complained), so she ended up wearing her hair slightly out of her hat, but in a bun.

29.    Throughout the duration of the season, Plaintiff was exposed to ongoing and persistent abuse and harassment by Hussey. And she regularly reported this conduct to the Communications Specialist, who reported it to Anderson. Notably, Hussey had recently been accused of mistreating another female employee, and yet Plaintiff was placed with him. Not only should Plaintiff have never been placed on his crew (and in her rookie season to boot), the NFL should have taken corrective action even before Plaintiff's employment began given its prior notice about his behavior. But they clearly did not. Some examples of Hussey's conduct are as follows (and this is not remotely an exhaustive list):

10

a. During the time when Anderson first started fixating on Plaintiff's hair (as described above), she went to Hussey for advice. Because she felt so much pressure to wear her hair a certain way (to Anderson's liking), she thought perhaps Hussey might be able to offer some guidance on how to deal with Anderson's directives. Hussey responded with clear disgust and shame towards Plaintiff, telling her things like, *who do you think you are?, you are to listen to the boss, and are you crazy?* In other words, how dare she ask Hussey for advice and guidance here; she was to do as she was told no matter how sexist and inappropriate of a request it was.

b. Hussey regularly told Plaintiff: "*shut your fucking mouth, RD,*" or words to that effect.

c. On one occasion, Hussey observed Plaintiff speaking with a seasoned coworker on the field following a foul call and a question she had about it (involving a nuance between college rules and NFL rules in penalty enforcement). In her view, there was plenty of time to have this discussion because a fight had broken out on the field; and that coworker gladly gave her guidance. After the game, Hussey reprimanded Plaintiff for talking to her coworker, and his message was clear – no talking on the field. There was no need to go beyond this interaction as Plaintiff expressed that she understood the directive. But it did not stop there. He later called her to berate her and make sure she knew she got her teammate in trouble and that it was all her fault. During that call, Hussey told her to more than once to "*shut [her] fucking mouth.*"

d. Hussey regularly used aggressive hand gestures towards Plaintiff to shut her down and often ignored her entirely. Plaintiff has video evidence of at least one of these

11

instances. It was at the New York Giants v. Washington game. Plaintiff is seen throwing a flag, and when she goes to report the foul to Hussey, he tells her to "*calm down*" and "*stop*," gesturing with his hand to shut her down. He literally ignored every word she said, and gladly spoke to her male peer who had also thrown a flag, before announcing the purpose of the flag.

e. Hussey was so vile towards Plaintiff that by the end of the season, he would not even speak to her.

30. It goes without saying that due to Hussey's treatment of Plaintiff, he never even attempted to give her the proper guidance and training she needed to succeed. For lack of better words, he helped sabotage her first season.

31. On top of everything else Plaintiff had to endure during the first season, the NFL did not even have the decency to get proper (e.g., gender appropriate) uniforms for Plaintiff, despite her ongoing and repeated requests which commenced before the 2022 season even began. This is inexcusable. Some examples of just how embarrassing and (for lack of better words) pathetic the uniform situation was are as follows:

a. For the majority of the 2022 season, Plaintiff was required to face the elements without appropriate gear (e.g., weather beater shirts or jackets) that fit her while all of her male counterparts had all the gear they needed to stay warm and dry. This was despite Plaintiff providing the uniform person her college weather shirt so he could determine her size. At times, the weather was simply unbearable but she worked through it nonetheless.

b. Several articles of clothing provided to Plaintiff was too big to even be tailored.

12

    c.    The response Plaintiff would receive to her complaints about the uniforms were to the effect of, "*we're doing the best we can, Robin.*"

    d.    By the end of the season, she did finally receive *some* cold weather gear. However, through the duration of her employment with the NFL, she never received any undergarments that fit (e.g., under shirts, compression/warming pants, socks, shower slides), nor was she given a single article of clothing with the NFL shield on it that fit her. As stated above, she ended up buying NFL shields and ironing them on the clothing she bought. This was her only viable option as the alternative was to wear men's clothing that did not fit her.

32.    Finally, it should be noted that throughout the duration of the 2022 season, Anderson (who was aware of Plaintiff's complaints) was the last say in every grade; he would either agree or disagree with the original graders and his word was final, meaning the system (by design) gave Anderson significant power over Plaintiff.

2023 Season (Alan Eck Crew)

33.    For her second NFL season, Plaintiff was placed on the Alan Eck ("Eck") crew.

34.    Below is a list (in no particular order of importance) of pertinent events from the 2023 season.

35.    In the 2023 season, Plaintiff was moved from down judge (the position she held in the 2022 season) to line judge. At the beginning of the season, Plaintiff was placed across from an experienced and respected official ("her Original 2023 Counterpart"). Unfortunately, her Original 2023 Counterpart took a bad hit in the beginning of the first quarter during the week one game. During the remainder of that game, Plaintiff worked the entire Line of Scrimmage by herself, and did well. She had hoped this was a sign of a better season ahead. But unfortunately,

her Original 2023 Counterpart was taken out (medically) for the season, so she waited to hear who her new partner would be (*a decision that was up to Anderson*). Plaintiff even asked Eck and Boston if they wanted her to move back to the down judge position (and they both agreed that would make sense), but Anderson said no. Ultimately, as the replacement for her Original 2023 Counterpart, Anderson chose someone who had been in the NFL for years, and for the entirety of those years, had worked as an umpire ("her Replacement 2023 Counterpart"). This is significant because, for anyone who understands football officiating and the difference between her Replacement 2023 Counterpart's former position and his new position across from Plaintiff, Plaintiff was forced to become the "veteran" line of scrimmage official for the 2023 season on the heels of what she had to endure during her first season. Being the team player she is, Plaintiff did everything in her power to manage this difficult situation, including training her Replacement 2023 Counterpart real-time on the field while attempting to do her own job.

36.    During Plaintiff's end of the year review via zoom (with Anderson, Boston, and the Communication Specialist in attendance) in or about February of 2024, Anderson mentioned a training opportunity that Boston would go over with her. That *alleged* training opportunity (which turned out to be a major event in Plaintiff's doomed NFL career) is described in detail herein in paras. 37-41. Also during the February 2024 zoom review, Anderson told Plaintiff that she needed to join the Frozen play on Broadway, and learn to sing "Let it Go," because her "issue" was a "mental one." He went on to state that the Communication Specialist would be busy in the off-season with Plaintiff (even more so than her trainer, Boston) because of the "mental" issue she was experiencing. Not only do Anderson's comments reveal his awareness that Plaintiff was struggling mentally (albeit without acknowledging it was in fact mental anguish he and Boston were instrumental in causing), the comments are also an admission that her mental state was

14

impacting her performance on the field. Anderson's comments also confirm his awareness that Plaintiff would share her issues and concerns with the Communication Specialist.

37. Here is what transpired with respect to the *alleged* training opportunity:

a. As it turned out, this *training opportunity* was a college clinic that Anderson and Boston helped run in Arkansas ("the Clinic"). In essence, lower level college officials would be there in classrooms and learn *college football* and then go work out on the field in front of supervisors with the hopes of being hired. Boston later told Plaintiff that the idea of sending her to the Clinic came "straight from" Anderson.

b. Ultimately, Boston and Anderson made clear that Plaintiff had no choice but to attend the Clinic, despite her Union *insisting* that she not attend. In one particularly troubling conversation with Boston wherein Plaintiff had expressed her concerns with going to the Clinic (including that she was being singled out, forced to endure extreme humiliation which would be a detriment to her NFL career), the following occurred:

    i. Boston asked Plaintiff if she was going to any other clinics to teach in the off-season. He then proceeded with nothing short of a direct threat. He said, "*I know you take notes, write this down*." He then stated that if Plaintiff finds out that Anderson is going to attend a clinic where she will be teaching (a reference to Plaintiff volunteering her time to teach high school and college officials), she should break her leg or figure out some other way to not be there when Anderson is present. This is because, according to Boston,

Anderson would find a way to embarrass her and publicly demean her for teaching and not being at the Clinic being "trained."

ii.   Boston then asked Plaintiff if she had *heard the rumors*, referring to another *female* official's impending termination (at the time, there were the only three female on-field officials, including Plaintiff). He proceeded to tell Plaintiff that she should listen to the rumors, that the other female official who was about to be terminated had said no to the same college clinic the year before, and that Plaintiff surely did not want to end up like her. In other words, rather than comparing her to any other NFL official, he chose to compare her to a *female* official who was apparently on the chopping block. This shows an inherent bias that was (again) used as a direct threat.

iii.  Boston also informed Plaintiff that if she attended the Clinic, she could receive significant one-on-one training time with him.

38.    Rather than treating Plaintiff as an NFL official and giving her a chance to succeed by getting proper <u>NFL</u> training in the off-season, the NFL forced her (with threats) to attend the Clinic (amongst her former college peers) that literally served no purpose other than to humiliate her and hinder her NFL career. No male NFL official had ever been required to take a training opportunity at a college clinic. Plaintiff even reported her concerns about attending this college clinic to the Communications Specialist who indicated that they would speak with Anderson about Plaintiff's concerns, apparently to no avail.

39.    Plaintiff did indeed attend, at her own expense, the Clinic, which took place in April of 2024:

16

a.  Prior to flying to Arkansas, Plaintiff had informed Boston that the evening she would be arriving in Arkansas (a Wednesday), she would need to attend a previously-scheduled zoom study group that was made up of experienced NFL officials (meaning an opportunity for study that was relevant to her NFL position). Her NFL study group had been meeting weekly on Wednesdays leading up to the Clinic, so she did not want to miss the study group.

b.  In response, Boston informed Plaintiff that she should instead listen to Anderson give a welcome speech at orientation night at the Clinic. In other words, she should listen to Anderson welcome everyone to the Clinic rather than participating in relevant NFL study to help further her NFL career.

c.  For the duration of the Clinic, Plaintiff was utterly humiliated each time she had to attend on-field assignments. Indeed, the teachers/trainers who attended the Clinic were Plaintiff's former peers from her college officiating days. Moreover, the campers she would be on the field with were officials that Plaintiff had taught in other clinics throughout the years.

d.  Plaintiff got very little one-on-one training time with Boston, and when she did, they simply went over all the plays they previously covered together during the season.

40.  And to really drive the point home: The Clinic situation was not merely a misunderstanding about the true intentions of Anderson (e.g., it was not a genuine attempt on the part of Anderson to help Plaintiff). It was a low-level college clinic, involving different rules, different mechanics, and different philosophies as compared to the NFL. The Clinic had nothing

to do with helping Plaintiff in her NFL career*; it was a male power play that served its purpose of humiliating Plaintiff, shattering her confidence, and significantly hindering her NFL career.*

41.    The Clinic situation resulted in the Union filing and successfully concluding a grievance on Plaintiff's behalf; the result being that the NFL reimbursed her for all of her expenses related to the Clinic, paid her "NFL officiating fee" for her time spent at the Clinic, and took her off her three-year probation one year early. So on top of everything she endured during the first and second seasons and already having complained about Anderson, Boston, Hussey's well-known and documented abuse, and being given men's uniforms (to name a few), Plaintiff had now filed a grievance before even completing her three-year probationary period. In reality, being taken off probation did not help. The damage had already been done during the first two seasons. There was nothing that could be done to rewrite history and the toll it had taken on Plaintiff to this point.

42.    Just like the 2022 season, throughout the duration of the 2023 season, Anderson continued to be the last say in every grade; he would either agree or disagree with the original graders and his word was final.

43.    Before the start of the 2024 season (which is discussed below), Anderson stepped down from his position as Senior Vice President of Officiating. Because his son was hired by the NFL, Anderson could no longer hold his position. Anderson had attempted to hire his son in the prior season, only to be told by the Union he could not do so.

44.    And speaking of Anderson's son, for the 2024 season, the NFL announced in or about May of 2024 that Anderson's son would take Plaintiff's position on the Eck crew. And to make matters worse, her Original 2023 Counterpart was back from his medical leave for the 2024 season so the training and experience she could have had with him in the 2024 season (that she

missed out on during the 2023 season) was instead given to Anderson's son as her replacement on the Eck crew.

2024 Season (Carl Cheffers Crew)

45. For her third NFL season, Plaintiff was placed on the Carl Cheffers ("Cheffers") crew; and Ramon George took over Anderson's role of Senior Vice President of Officiating, meaning George was now her direct supervisor.

46. Below is a list (in no particular order of importance) of pertinent events from the 2024 season:

47. On the heels of the grievance that was directed towards the conduct of Boston and Anderson, Plaintiff continued to be assigned to Boston as her trainer which in turn meant she needed to drive him around and continue to spend time with him. Thereafter, Plaintiff told Cheffers she was not comfortable having Boston as her trainer after his previous treatment of her; and ultimately Cheffers assisted in having Plaintiff assigned to a new trainer.

48. Also in her third season, the officials were no longer given access to the Communication Specialist.

49. A new grading system (to replace the one where Anderson had the final word) was implemented as follows: There would be a group of people (comprised of all men, ranging from retired NFL officials, to retired NFL coaches, and retired NCAA officials) deciding the grades. These graders were comprised of many of the same men that collaborated on grades in Plaintiff's preceding seasons; men with close ties to Anderson and Boston and with direct knowledge of Plaintiff's grievance. For the 2024 season, each game would have a grader go through the film and give officials their grades (e.g., No Calls, Incorrect Calls, Correct Calls, Missed No Calls, Incorrect Mechanics). Officials would then comment back to the grader. On Wednesdays, the

19

graders were to go over every play from the weekend's games that received a grade from a grader. They were to vote and come to an agreement on what each grade should be. Only the plays that got "marked" by a grade from the original grader would be reviewed, voted on, and definitively graded. Once the officials received the collaboration's results of the game, the grades were supposed to be final.

50.    From the outset, there were a lot of kinks to be worked out with this new system. But more importantly, Plaintiff has identified numerous instances in her season three grading where the final grades were objectively inaccurate despite the collective experience of the graders and presumed ability to assign accurate grades. To make matters worse, Plaintiff has also identified instances of her male counterparts being treated more favorably under the season three grading system than she was (when applying apples-to-apples on the type of call that was being graded). The NFL applied its season three grading system in a disparate and inconsistent manner, subjecting Plaintiff to more stringent (and at times objectively incorrect) standards than similarly situated employees outside of her protected class. Yet, this grading system was referred to in Plaintiff's termination letter as at least one metric (if not the most significant metric, at least according to the letter) used for her termination. Plaintiff is informed and believes and thereon alleges that her termination was set in motion in advance of season three and that regardless of her performance, her season three grades were going to be used as a pretext for her eventual termination. Plaintiff is also informed and believes and thereon alleges that Anderson continued to have a say in the grades in season three despite the fact that he no longer held his position as Senior Vice President of Officiating and despite the fact that he was not supposed to have a say in the grades due to his son's role as an official.

51.   Throughout the season, Plaintiff was taken off five games with her crew (on information and belief, more games than any other official), despite being originally slated to work with her crew on all games. This was significant because the rotation of graders was not the same for Plaintiff as it was for others, resulting in less consistency for her than for any other official. Plaintiff was singled-out in this respect.

52.   In the middle of the season, the front office assigned Plaintiff to a new trainer ("her 2024 Trainer"). And she started regularly receiving "EXCELLENT" comments directly from her 2024 Trainer as the season progressed. Not only that, two of the referees with whom she was placed (on other crews) told her they would be calling George to tell him they would have her on their crew for the following year.

Termination And Post-Termination

53.   The years of unlawful conduct described herein culminated into Plaintiff's final fate on February 18, 2025 when her employment was terminated. George delivered the news over the phone, followed by a termination letter. According to the termination letter, the decision was based upon the totality of all three seasons (meaning the seasons wherein she was harassed and discriminated and retaliated against, was suffering mentally, was graded by Anderson, complained, and filed a grievance). The letter also claims that George personally made the decision to terminate Plaintiff but this is impossible as he had no personal knowledge about her three-year performance history and would have needed to use information prepared or conveyed by other people (e.g., Anderson and/or Boston) who did have such knowledge.

54.   To make matters worse, since her firing, George has given reports to authors on the internet that he/the NFL got Plaintiff her job back in college officiating, suggesting to the public that the NFL not only treated her well on the way out but that she did not have the ability to get

her own former job back (despite her impeccable college career and great relationship with her former superiors at the college level). These false statements caused further humiliation for Plaintiff.

55.    Also since her firing, the NFL announced four officials would be joining the UFL in the off season to get more training. One of the men sent to the UFL was hired in the same officiating class as Plaintiff. Not only did the NFL refuse to reinstate Plaintiff after she raised many of the issues set forth herein, they also refused to do anything to help her get into the UFL other than to say they would not be opposed to her trying to get hired, while claiming they had no ability to assist in that process. The NFL's tepid response – an empty offer lacking follow-through – speaks volumes about its true intentions and priorities. A comparable male official would have received (and did receive) meaningful support and a real opportunity.

Lasting Effects

56.    Plaintiff earned her place in the NFL. She worked her way through two decades of officiating – breaking barriers, making history, and outperforming expectations at every level – only to be met with hostility, retaliation, and systemic inequality the moment she stepped into a league that claims to champion opportunities for women. Instead of supporting one of the only women on its officiating staff, the NFL exposed her to unchecked harassment, denied her the resources given to men, manipulated her training and grading opportunities, and ultimately ended her career based on tainted evaluations created by the very people who discriminated against her.

57.    No amount of public relations messaging can rewrite what the evidence shows: Plaintiff was failed by an institution that promotes inclusion in press releases but refuses to practice it when it matters. Her firing was not the result of performance – it was the culmination of years of gender-based discrimination, humiliation, and retaliation that no male official ever

22

endured. The NFL's refusal to reinstate her, assist a transition to the UFL, or correct the public narratives it helped create only further underscores its disregard for the women it claims to support.

58.    The harm to Plaintiff's career is irreversible. The emotional and reputational damage is immense.

## FIRST CAUSE OF ACTION
### Violation of Title VII – Gender Discrimination – Against the NFL

59.    Plaintiff repeats paragraphs 1 through 58 of this Complaint with the same force and effect as if more fully set forth herein.

60.    By the acts and practices described above, the NFL has discriminated against Plaintiff on the basis of her gender, in violation of Title VII.

61.    The NFL has acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under Title VII.

62.    As a result of the NFL's discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

## SECOND CAUSE OF ACTION
### Violation of NYSHRL – Gender Discrimination – Against All Defendants

63.    Plaintiff repeats paragraphs 1 through 62 of this Complaint with the same force and effect as if more fully set forth herein.

64.    By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender, in violation of the NYSHRL. Defendants Anderson and Boston are individually liable under the NYSHRL because they directly participated in, aided and abetted, and/or incited the unlawful conduct

23

described herein, including through their supervisory authority, control over Plaintiff's training and evaluations, and their personal involvement in the acts taken against Plaintiff.

65.     Defendants have acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under the NYSHRL.

66.     As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

**THIRD CAUSE OF ACTION**
**Violation of NYCHRL – Gender Discrimination – Against all Defendants**

67.     Plaintiff repeats paragraphs 1 through 66 of this Complaint with the same force and effect as if more fully set forth herein.

68.     By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender in violation of the NYCHRL.

69.     Defendants engaged in unlawful conduct with willful or wanton negligence, with recklessness, and/or with a conscious disregard of plaintiffs' rights or conduct so reckless that it amounts to such disregard. Defendants Anderson and Boston are individually liable under the NYCHRL because they directly participated in and were personally involved in the unlawful conduct, and because they aided, abetted, incited, compelled, and/or coerced such conduct. The NYCHRL imposes liability broadly on individuals who play any role in unlawful discrimination, harassment, or retaliation.

70.     As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

24

## FOURTH CAUSE OF ACTION
### Violation of NJLAD – Gender Discrimination – Against all Defendants

71.     Plaintiff repeats paragraphs 1 through 70 of this Complaint with the same force and effect as if more fully set forth herein.

72.     By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender in violation of the NJLAD. Defendants Anderson and Boston are individually liable under the NJLAD because they actively participated in and substantially assisted the unlawful conduct, including through their supervisory roles, decision-making authority, aiding and abetting, and direct involvement in the actions taken against Plaintiff.

73.     Defendants have acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under the NJLAD.

74.     As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## FIFTH CAUSE OF ACTION
### Violation of Title VII – Harassment – Against the NFL

75.     Plaintiff repeats paragraphs 1 through 74 of this Complaint with the same force and effect as if more fully set forth herein.

76.     By the acts and practices described above, the NFL created a hostile work environment (harassment) against Plaintiff on the basis of her gender, in violation of Title VII.

77.     The NFL has acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under Title VII.

78.    As a result of the NFL's conduct, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

## SIXTH CAUSE OF ACTION
### Violation of NYSHRL – Harassment – Against All Defendants

79.    Plaintiff repeats paragraphs 1 through 78 of this Complaint with the same force and effect as if more fully set forth herein.

80.    By the acts and practices described above, Defendants created a hostile work environment (harassment) on the basis of her gender, in violation of the NYSHRL. Defendants Anderson and Boston are individually liable under the NYSHRL because they directly participated in, aided and abetted, and/or incited the unlawful conduct described herein, including through their supervisory authority, control over Plaintiff's training and evaluations, and their personal involvement in the acts taken against Plaintiff.

81.    Defendants have acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under the NYSHRL.

82.    As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## SEVENTH CAUSE OF ACTION
### Violation of NYCHRL – Harassment – Against all Defendants

83.    Plaintiff repeats paragraphs 1 through 82 of this Complaint with the same force and effect as if more fully set forth herein

84.    By the acts and practices described above, Defendants created a hostile work environment (harassment) on the basis of her gender in violation of the NYCHRL. Defendants

26

Anderson and Boston are individually liable under the NYCHRL because they directly participated in and were personally involved in the unlawful conduct, and because they aided, abetted, incited, compelled, and/or coerced such conduct. The NYCHRL imposes liability broadly on individuals who play any role in unlawful discrimination, harassment, or retaliation.

85.    Defendants engaged in unlawful conduct with willful or wanton negligence, with recklessness, and/or with a conscious disregard of plaintiffs' rights or conduct so reckless that it amounts to such disregard.

86.    As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

**EIGHTH CAUSE OF ACTION**
**Violation of NJLAD – Harassment – Against all Defendants**

87.    Plaintiff repeats paragraphs 1 through 86 of this Complaint with the same force and effect as if more fully set forth herein.

88.    By the acts and practices described above, Defendants created a hostile work environment (harassment) on the basis of her gender in violation of the NJLAD. Defendants Anderson and Boston are individually liable under the NJLAD because they actively participated in and substantially assisted the unlawful conduct, including through their supervisory roles, decision-making authority, aiding and abetting, and direct involvement in the actions taken against Plaintiff.

89.    Defendants have acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under the NJLAD.

27

90. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

### NINTH CAUSE OF ACTION
### Violation of Title VII – Retaliation – Against the NFL

91. Plaintiff repeats paragraphs 1 through 90 of this Complaint with the same force and effect as if more fully set forth herein.

92. By the acts and practices described above, the NFL retaliated against Plaintiff for her complaints about and opposition to unlawful conduct, in violation of Title VII.

93. The NFL has acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under Title VII.

94. As a result of the NFL's conduct, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

### TENTH CAUSE OF ACTION
### Violation of NYSHRL – Retaliation – Against All Defendants

95. Plaintiff repeats paragraphs 1 through 94 of this Complaint with the same force and effect as if more fully set forth herein.

96. By the acts and practices described above, Defendants retaliated against Plaintiff for her complaints about and opposition to unlawful conduct, in violation of the NYSHRL. Defendants Anderson and Boston are individually liable under the NYSHRL because they directly participated in, aided and abetted, and/or incited the unlawful conduct described herein, including through their supervisory authority, control over Plaintiff's training and evaluations, and their personal involvement in the acts taken against Plaintiff.

97.    Defendants have acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under the NYSHRL.

98.    As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

**ELEVENTH CAUSE OF ACTION**
**Violation of NYCHRL – Retaliation – Against all Defendants**

99.    Plaintiff repeats paragraphs 1 through 98 of this Complaint with the same force and effect as if more fully set forth herein.

100.    By the acts and practices described above, Defendants retaliated against Plaintiff for her complaints about and opposition to unlawful conduct in violation of the NYCHRL. Defendants Anderson and Boston are individually liable under the NYCHRL because they directly participated in and were personally involved in the unlawful conduct, and because they aided, abetted, incited, compelled, and/or coerced such conduct. The NYCHRL imposes liability broadly on individuals who play any role in unlawful discrimination, harassment, or retaliation.

101.    Defendants engaged in unlawful conduct with willful or wanton negligence, with recklessness, and/or with a conscious disregard of plaintiffs' rights or conduct so reckless that it amounts to such disregard.

102.    As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

29

**TWELFTH CAUSE OF ACTION**
**Violation of NJLAD – Retaliation – Against all Defendants**

103. Plaintiff repeats paragraphs 1 through 102 of this Complaint with the same force and effect as if more fully set forth herein.

104. By the acts and practices described above, Defendants retaliated against Plaintiff for her complaints about and opposition to unlawful conduct in violation of the NJLAD. Defendants Anderson and Boston are individually liable under the NJLAD because they actively participated in and substantially assisted the unlawful conduct, including through their supervisory roles, decision-making authority, aiding and abetting, and direct involvement in the actions taken against Plaintiff.

105. Defendants have acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under the NJLAD.

106. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

**PRAYER FOR RELIEF**

107. WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

   a. declaring that the acts and practices complained of herein are in violation of the Title VII, the NYSHRL, the NYCHRL, and the NJLAD;

   b. enjoining and permanently restraining these violations;

   c. directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff;

30

d.  directing Defendants to place Plaintiff in the position she would have occupied but for the unlawful conduct and making her whole for all earnings and other benefits she would have received but for Defendants' unlawful treatment, including, but not limited to, wages, bonuses, pension, and other lost benefits;

e.  directing Defendants to pay Plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering;

f.  directing Defendants to pay Plaintiff punitive damages;

g.  awarding Plaintiff her reasonable attorneys' fees and costs;

h.  awarding Plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award; and

i.  granting such other and further relief as the Court deems necessary and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure,

a trial by jury in this action.

Dated:

VLADECK, RASKIN & CLARK, P.C.

By:  */s/ Anne L. Clark*

Anne L. Clark
Emily Bass
Attorneys for Plaintiff
111 Broadway, Suite 1505
New York, New York 10006
(212) 403-7300